```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------- x
THE BANK OF NEW YORK,                           :
                                                :       03 Civ. 9055 (CSH)
                  Interpleader Plaintiff,       :
                                                :
          -against-                             :       MEMORANDUM OPINION
                                                :             AND ORDER
YUGOIMPORT SDPR J.P., REPUBLIC OF               :
CROATIA, and REPUBLIC OF SLOVENIA,              :
                                                :
                  Interpleader Defendants.      :
--------------------------------------------------------------- x
```

HAIGHT, Senior District Judge:

In this interpleader action, the interpleaded defendants have filed cross-motions for distribution of the funds in the Court registry which are the subject of their conflicting claims. Reflecting that conflict, the parties dispute the manner in which the distribution should be made.

### I. PROCEDURAL HISTORY

The interpleader plaintiff, The Bank of New York ("BNY"), filed its complaint in state court pursuant to N.Y. C.P.L.R. § 1006. BNY's interpleader complaint alleged that it held on deposit the sum of $2,551,785.37 (plus interest) in an account in the name of interpleaded defendant Yugoimport SDPR-J.P. ("Yugoimport"), to which interpleaded defendants the Republic of Croatia ("Croatia") and the Republic of Slovenia ("Slovenia") had asserted claims.

Slovenia removed the case to this Court pursuant to 28 U.S.C. §§ 1441 and 1446, asserting as the ground for removal that this is a civil action brought against a foreign nation, as that term is defined in 28 U.S.C. § 1603(a). No party has questioned this Court's subject matter jurisdiction, and the Court's independent inquiry established its existence.

The case proceeded in this Court. I have written two prior opinions, reported at 2004 WL

1145836 (S.D.N.Y. May 21, 2004) ("*Yugoimport I*") and 2005 WL 2429424 (S.D.N.Y. Oct. 3, 2005) ("*Yugoimport II*"), familiarity with which is assumed. *Yugoimport I* specified the procedures by which BNY would be permitted to transfer the deposited funds to the Court registry and be discharged from the action. That transfer was accomplished and BNY was discharged by subsequent order. Yugoimport, Croatia, and Slovenia press their claims to the interpleaded funds. *Yugoimport II* directed limited discovery into the agency status of Yugoimport's predecessor in interest, under the circumstances more fully described in Part II., *infra*.

Croatia and Slovenia (hereinafter "the Republics") now move jointly for an order directing distribution of the interpleaded funds among the several interpleaded defendants in accordance with the international agreement discussed *infra*, or in the alternative for a stay pending resolution of interpretative issues arising out of that agreement by an international committee the agreement created. The Republics do not style their motion as one for summary judgment under Rule 56, Fed. R. Civ. P., but I treat it as such because the first prong of the motion seeks the ultimate relief. Yugoimport cross-moves for summary judgment pursuant to Rule 56 directing payment to it of the full amount of the funds.

## II. BACKGROUND

**A.     The Creation of the Funds Which Are the Subject Matter of this Interpleader Action**

In October 1991, BNY opened an account in the name of the "Federal Directorate of Supply and Procurement," whose mailing address was in Belgrade. By October 2002, the name of the account had been changed to "Jugoimport SDPR."[1]

The Federal Directorate of Supply and Procurement (hereinafter "FDSP") was a creation of

---

[1] *See* BNY Statement of Account, Shields Decl. (verified Sept. 22, 2006), Ex. 1.

the then-existing Socialist Federal Republic of Yugoslavia ("SFRY").  The legal status of the FDSP *vis-a-vis* the SFRY is a matter of dispute between the parties.

In 1992 the funds on deposit in BNY were frozen under regulations imposing economic sanctions against certain Yugoslavian property issued by the Office of Foreign Assets Control of the United States Department of the Treasury.[2]  On December 27, 2002, that Treasury Office issued a decision which, as of February 25, 2003, lifted the restrictions on certain previously blocked Yugoslavian assets, including the funds in suit on deposit with BNY.[3]  The present parties' rival claims to those funds prompted BNY's interpleader complaint, dated April 14, 2003, which alleged that BNY then held on deposit $2,551,785.37 (plus interest).  These are the funds that are deposited in the Court registry.

**B.   The Dissolution of the Socialist Federal Republic of Yugoslavia and Emergence of the Successor States**

This case requires us to revisit the tumultuous and tragic times when the former SFRY ceased to exist and was replaced by five new nations, usually referred to as the "Successor States," the term I will use in this opinion.

Beginning in 1991, the SFRY faced political upheaval and military conflict that eventually led to its disintegration.  As a result, the SFRY was replaced by five Successor States: Slovenia, Croatia, Bosnia-Herzegovina, Macedonia, and the Federal Republic of Yugoslavia ("FRY"), which was composed of Serbia and Montenegro.[4]  Wars between the FRY and the other Successor States,

---

[2] BNY Interpleader Complaint ¶ 8.

[3] *Id*. ¶ 9.

[4] The Republics' Reply Brief states at page 9 n.8 without subsequent contradiction that following dissolution of the SFRY, "the remaining Republics of Serbia and Montenegro formed

most notably Bosnia-Herzegovina, raged from the end of 1991 until 1995. "A by-product of this conflict has been a number of civil suits in this country involving the SFRY, its agencies and state-owned companies, and the successor states, regarding their assets and liabilities in the United States." *767 Third Ave. Assocs. v. Consulate Gen. of Socialist Fed. Republic of Yugoslavia*, 218 F.3d 152, 155 (2d Cir. 2000).[5] The case at bar is another example of such litigation.

In late 1995, following intense negotiations mediated primarily by the United States, the FRY and the other Successor States signed the Dayton Accords marking the end of the armed conflict in Bosnia. Simultaneously, a Peace Implementation Council was established in order to arrive at a comprehensive resolution of succession issues among the Successor States.

C.  **The Succession Agreement and the Standing Joint Committee**

The five Successor States achieved that comprehensive resolution on June 29, 2001, when their representatives met at Vienna and signed an Agreement on Succession Issues Between the Five Successor States of the Former State of Yugoslavia (the "Succession Agreement") which *inter alia* created a Standing Joint Committee tasked with implementing the Succession Agreement and serving as a forum for the discussion and resolution of issues that might arise during that implementation. The Succession Agreement and its accompanying Annexes and Appendices are in English. The full texts are printed at 41 I.L.M. 3 (2002).

---

the FRY in 1992. The FRY existed from 1992 until 2003 at which time it was constituted as a looser State Union of Serbia and Montenegro. In June 2006, the Republics of Serbia and Montenegro formally declared their independence as separate states." Notwithstanding this most recent division, the briefs of counsel continue to refer to the *five* "Successor States," and there is no suggestion by any party that the Succession Agreement discussed in text *infra* is in any way affected by it.

[5] The historical account contained in this paragraph of text is taken from Judge Feinberg's opinion for the court of appeals in *767 Third Avenue*.

    **1.**    **The Succession Agreement**

Given the strife and bloodshed of the immediately preceding years, the Succession Agreement must be regarded as a very considerable diplomatic achievement.

The preamble's first paragraph recites that Bosnia and Herzegovina, the Republic of Croatia, the Republic of Macedonia, the Republic of Slovenia, and the Federal Republic of Yugoslavia are "in sovereign equality the five successor States to the former Socialist Federal Republic of Yugoslavia." The preamble goes on to recite the Successor States' intention "to resolve questions of State succession arising upon the break-up of the former Socialist Federal Republic of Yugoslavia," with particular reference "to identifying and determining the equitable distribution amongst themselves of rights, obligations, assets and liabilities of the former Socialist Federal Republic of Yugoslavia," and declares the Successor States' "readiness to co-operate in resolving outstanding succession issues in accordance with international law."

Article 3 of the Succession Agreement provides: "The Annexes listed below set out the terms on which the subject matter of each Annex is settled." Annex C is captioned "Financial Assets and Liabilities." That is the Annex which is relevant to the case at bar.

Annex C contains provisions for settling both the assets and the liabilities of the former SFRY among the Successor States. With respect to assets, Article 1 of Annex C provides in pertinent part:

> The SFRY's financial assets comprised all financial assets of the SFRY (such as cash, gold and other precious metals, deposit accounts, and securities), including in particular –
>
> (a) accounts and other financial assets in the name of the SFRY Federal Government Departments and Agencies; . . .

Article 5(2) of Annex C provides that "[t]he available foreign financial assets identified in paragraph (1) shall be distributed according to the following proportions . . . Bosnia and Herzegovina 15.50%; Croatia 23.00%; Macedonia 7.50%; Slovenia 16.00%; and Federal Republic of Yugoslavia 38.00%."

The Succession Agreement reflects the common sense awareness of the Successor States that disputes might arise with respect to the proper distribution of assets covered by the Agreement. Article 5 of the Agreement provides in pertinent part:

> (1) Differences which may arise over the interpretation and application of this Agreement shall, in the first place, be resolved in discussion among the States concerned.
>
> (2) If the differences cannot be resolved in such discussions within one month of the first communication in the discussion the States concerned shall either
>
> (a) refer the matter to an independent person of their choice, with a view to obtaining a speedy and authoritative determination of the matter which shall be respected and which may, as appropriate, indicate specific time-limits for actions to be taken; or
>
> (b) refer the matter to the Standing Joint Committee established by Article 4 of this Agreement for resolution.

### 2. The Standing Joint Committee

Article 4 of the Succession Agreement provides:

> (1) A Standing Joint Committee of senior representatives of each successor State, who may be assisted by experts, is hereby established.
>
> (2) This Committee shall have as its principal tasks the monitoring of the effective implementation of this Agreement and serving as a forum in which issues arising in the course of its implementation may be discussed. The Committee may as necessary make appropriate recommendations to the Governments of the successor States.

Article 4(3) provides that, after the first formal meeting of the Standing Joint Committee two months after the Succession Agreement entered into force, "[t]he Committee may meet informally, and on a provisional basis, at any times convenient to the successor States after the signature of this Agreement." Article 4(4) provides that "[t]he Committee shall establish its own rules of procedure."

The quoted provisions of Articles 4 and 5, when read together, create a method of alternate dispute resolution. If differences between Successor States "arise over the interpretation and application" of the Agreement, the States involved first attempt to resolve the dispute in discussions among them, but if the differences cannot be resolved in that fashion they may either be referred to "an independent person of their choice" for a "speedy and authoritative determination of the matter," or referred to the Standing Joint Committee "for resolution." The Standing Joint Committee, comprised of "senior representatives of each successor State," who "may be assisted by experts," has "as its principal tasks the monitoring of the effective implementation of this Agreement and serving as a forum in which issues arising in the course of its implementation may be discussed," following which the Committee "may as necessary make appropriate recommendations to the Governments of the successor States."

**D. The Parties' Motions**

The parties cross-move for summary judgment. Each movant bears the burden of showing "that there is no genuine issue as to any material fact" and that it "is entitled to a judgment as a matter of law." Rule 56(c).

According to the Republics, the record makes it obvious that when FDSP opened its account with BNY, it was a "Department" or "Agency" of the SFRY, as those words are used in Annex C of the Succession Agreement, so that, since the present Yugoimport is the successor in interest of

FDSP, the interpleaded funds are governed by the Succession Agreement and should be distributed to the five Successor States in accordance with the Agreement's formula.[6]

According to Yugoimport, the same record makes it obvious that the FDSP had the status of a "legal person" separate from the SFRY, so that the Succession Agreement does not govern the funds and they should be distributed to Yugoimport.

In the alternative, the Republics ask the Court to refer to the Standing Joint Committee any questions about the interpretation or implementation of the Succession Agreement with respect to these funds, staying proceedings here in the interim. Yugoimport responds that the Court should not refer these issues to the Standing Joint Committee because Yugoimport is a non-signatory to the Agreement which created it, is not bound by the Agreement's forum-selection or dispute resolution provisions, and "would have no standing" before the Committee.[7]

## III.  DISCUSSION

### A.    Justiciability of the Conflicting Claims

At the threshold, I must determine whether the proper distribution of the interpleaded funds presents this Court with a justiciable question. I conclude that it does.

In *767 Third Avenue*, the Second Circuit dealt with a claim of unpaid rent by New York City landlords who had leased space for consular offices to the SFRY. Following the dissolution of the

---

[6] The Republics' papers do not specify what the distributions directed by the Court should be. Presumably they would accord with the percentages stated in Article 5(2) of Annex C to the Succession Agreement, quoted in Part II.B.1., *supra*. By that formula, Croatia would receive 23% of the interpleaded funds, Slovenia 16%, and the Federal Republic of Yugoslavia 38%. The Republics do not say how the Court should make distributions to the other two Successor States, who are not parties to this litigation: Bosnia and Herzegovina (15.5%) and Macedonia (7.5%).

[7] Yugoimport's Br. at 4.

SFRY and the emergence of the Successor States, as described *supra,* the landlords sought a determination by this Court that SFRY's five Successor States were liable for that debt incurred by SFRY. The landlords also asked the district court to allocate that debt among the Successor States.

This Court, in an opinion by the late Judge Motley reported at 60 F. Supp. 2d 267 (S.D.N.Y. 1999), held that the circumstances prevailing at the time of the action raised political questions that a federal court was not competent to decide. The landlords appealed. The Second Circuit affirmed the district court's decision as to justiciability, but held that the case should be dismissed rather than stayed. 218 F.3d at 155.

The Second Circuit observed that while in 1999 and 2000 efforts were underway "in order to arrive at a comprehensive resolution of succession issues among the successor states," negotiations on the subject "have been sporadic but are still continuing," and "no agreement between the SFRY and the successors regarding assumption of SFRY's liabilities has been formulated yet." 218 F.3d at 156, 161. The same was true of a distribution of the former SFRY's assets.

In those particular circumstances, the Second Circuit accepted the positions taken by the State Department in an amicus brief that "liability, if it exists, cannot attach to the Successor States in the absence of a political determination, which has not yet been made" and "the policy of the United States has been to support the international process as the means to pursue resolution." "Thus," the court of appeals said, "the executive branch has apparently made the initial policy determination that resolution of issues such as debt allocation among the successors to the SFRY must be resolved in an international forum." 218 F.3d at 160. The claims in *767 Third Avenue* were held to be nonjusticiable under the political question doctrine. *Id*. at 164.

As we have seen, in 2001 the five Successor States entered into the Succession Agreement.

9

That renders the case at bar justiciable. In *767 Third Avenue* Judge Motley said: "Once the appropriate forum determines the political questions of succession, a court no longer should refuse to exercise its jurisdiction over the case." 60 F. Supp. 2d at 277. The Second Circuit said: "[O]nce the successors resolve these issues by treaty or another type of agreement, courts may interpret and enforce rights created by such an agreement." 218 F.3d at 162 n.7. We have now reached that moment in history.[8]

**B.     The Status of the FDSP and Yugoimport, its Successor in Interest**

   **1.     The Contentions of the Parties**

When in October 1991 the account in question was opened at BNY in the name of the FDSP, the former Yugoslavian state (SFRY) had not yet dissolved into the five Successor States. In a prior opinion I held that the Republics were

> authorized to serve documents and interrogatories limited to the following two subjects: (1) the formation, function, funding and management structure of the entity formerly known as the Federal Directorate of Supply and Procurement, and (2) the relationship between the entity formerly known as the Federal Directorate of Supply and Procurement and the former SFRY government.

*Yugoimport II*, 2005 WL 2429424, at *2.

In response to that discovery, a number of documents were produced, Yugoimport answered some of the Republics' interrogatories,[9] and independent inquiries by counsel generated additional

---

[8] The preceding analysis applies if, as the Republics argue, the interpleaded funds were SFRY funds governed by the Succession Agreement. Alternatively, if the funds were beyond the reach of the SFRY and the Succession Agreement altogether, as Yugoimport argues, then this case does not raise political questions relating to the succession of SFRY assets.

[9] Counsel for Yugoimport employed a familiar litigation tactic: voicing broadly worded objections to the scope and relevance of the interrogatories, and then furnishing narrowly worded answers.

10

documents.  The documents presently in the record include laws and corporate enabling statutes promulgated by the SFRY and later by the FRY, and decisions of courts in Belgrade, all presented in Serbian, the original language, and accompanied (fortunately) by English translations.  From this record, the parties draw diametrically opposite conclusions.  The Republics say the record shows "that Yugoimport is the successor to the FDSP, and that the FDSP was an agency of the SFRY, requiring the funds to be distributed pursuant to the Succession Agreement."  Republics' Reply Br. at 3.  Yugoimport says the record shows that because of "the FDSP's corporate status under SFRY law," the interpleaded funds "originally held by the FDSP belonged to the FDSP—not to the SFRY—and passed to Yugoimport as the FDSP's undisputed successor—not to the SFRY's Successor States."  Yugoimport's Reply Br. at 2.

While the parties disagree about the status of the FDSP and its successor in interest, Yugoimport, the genealogy of these entities appears to be undisputed.  The original FDSP was established by a law passed by the SFRY legislature in April 1974.  At that time the FDSP was merged with a then-existing company called Yugoimport.  That original Yugoimport had been established by a law passed by the Federal Peoples' Republic of Yugoslavia ("FPRY") in June 1949.  At the times these laws were enacted (1949 and 1974), the formidable Marshal Tito was president of the FPRY and subsequently of the SFRY; the change of the federated nation state's name does not appear to be relevant to the present issues.  In February 1991 the SFRY legislature passed a law establishing a new FDSP.  In September 1996, some four years after the dissolution of the SFRY, the legislature of the FRY (one of the five Successor States) passed a law creating the present Yugoimport, whose full name is "Yugoimport-SDPR, J.P."  Yugoimport is an arms merchant; or, as its website states more elegantly:

> Yugoimport-SDPR is a fully state owned company representing Council of Ministers of Serbia and Montenegro, Ministry of Defence and defence industrial complex in the field of military-technical cooperation, namely export and import of armament and defence equipment and associated technology transfer.

Yugoimport's website goes on to say:

> Company was founded on June 27, 1949 as state agency involved in export of raw material and machinery for defence industry. Soon, Yugoslav defence industry expanded its capabilities and large portion of capacity was available for sale on global market. Therefore, Yugoimport transformed its activity and started to export products and technologies. Following several restructurizations, Yugoimport has become public enterprise, fully state owned, carrying the name Yugoimport-SDPR. This name symbolizes synergy of two entities: Yugoimport, which was originally involved in export of armament and defence equipment and SDPR (FDSP - Federal Directorate of Supply and Procurement) procurement arm of Ministry of Defence of former Socialist Federative Republic of Yugoslavia.

*See* Republics' Br. at 3-4.

From these documents, the parties glean words and phrases which they contend support their competing characterizations of the FDSP and its successor, Yugoimport. The Republics rely upon the quoted language from Yugoimport's website, as well as an earlier version which described Yugoimport's "mission" as "[r]epresenting the Government" and the company as "[f]ully owned by the Government of FR Yugoslavia," which the Republics say make Yugoimport a self-proclaimed "department" or "agency" of the FRY as those words are used in the Succession Agreement, a status entirely consistent with the "numerous indicia of continued government ownership and control of the FDSP" found in the 1991 Law, Republics' Br. at 6, as well as the 1996 Law. Yugoimport argues that its website language is not determinative of the issue; one must look to "the relevant law and charter documents," which make it "beyond dispute that the FDSP was set up as a company distinct

from the SFRY." Yugoimport's Br. at 12. "Of particular note," the argument continues, "the 1991 law provided that [t]he Directorate [FDSP] has the status of a legal person." *Id*. at 13.

    **2.**    **The Governing Law**

The parties advance differing views of the governing law because they do not agree on the decisive issue. To a substantial degree, the parties' briefs are like ships on different courses that (unlike the *Andrea Doria* and the *Stockholm)* pass in the night without colliding.

Yugoimport contends that "with regard to the issue whether the FDSP had the status of a corporation (and thus a separate legal entity), the Court should look to the law of the SFRY," but that "federal common law, including principles of international law, applies to the issue whether to disregard the separate identity of the FDSP in this case," and "the issue whether to pierce the corporate veil of the FDSP is squarely relevant" to a proper distribution of the interpleaded funds. Yugoimport's Br. at 11-12 (footnote omitted), Yugoimport's Reply Br. at 3.

In the Republics' view, "the only relevant issue here—which has nothing to do with the issue of 'alter ego' addressed in Yugoimport's brief—is whether the FDSP was a state agency of the SFRY, thereby making the interpleaded funds in the account of the FDSP's conceded successor Yugoimport subject to distribution under the Succession Agreement." Republics' Reply Br. at 2. Since that is "the only relevant issue," then the Republics "do not need to show that the FDSP was also an 'alter ego' of the SFRY, because its agency status alone is sufficient to bring it within the terms of the Succession Agreement," *id*., which covers assets "in the name of the SFRY Federal Government Departments and Agencies."

The only note in common struck by the briefs of counsel is found in the Republics' argument that "there is plainly no incompatibility between the FDSP's separate legal identity and its status as

a government agency *under SFRY law*," Republics' Reply Br. at 4 (emphasis added), a seeming acceptance of the unsurprising proposition that SFRY law governs the status of the FDSP *vis-a-vis* the nation state whose legislative acts created it.

In addressing the assertedly "squarely relevant" issue of FDSP veil piercing, Yugoimport's briefs rely principally upon *First National City Bank v. Banco Para El Commercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611 (1983). In order to evaluate *Bancec*'s applicability to the case at bar, it is necessary to consider the case at some length.

In April 1960 the Cuban government passed a law establishing Bancec as the legal successor to a trading bank established in 1954 and jointly owned by the government and private banks. The law provided that Bancec would serve as "[a]n official autonomous credit institution for foreign trade . . . with full juridical capacity . . . of its own . . . " 426 U.S. at 613. The government supplied all of Bancec's capital and owned all its stock. Bancec's stated purpose was to collaborate with Banco Nacional, Cuba's central bank, with respect to foreign trade. In August 1960 Bancec agreed to purchase a quantity of sugar from a Cuban government instrumentality and sell it to a Canadian company. The latter sale agreement was supported by an irrevocable letter of credit in favor of Bancec issued by Citibank, a United States bank, on August 18, 1960, which Bancec assigned to Banco Nacional for collection.

On September 17, 1960, the Cuban government passed a resolution ordering that all of the Cuban properties of three United States banks, including Cuban branches of Citibank, be nationalized through forced expropriation. Before the banks were nationalized, the sugar covered by Citibanks's letter of credit was delivered to a U.S. Gulf port, and Banco Nacional presented Bancec's draft to Citibank for payment. Citibank credited the requested amount to Banco Nacional's

account and applied the balance in Banco Nacional's account as a setoff against the value of its expropriated Cuban branches. Bancec brought suit on the letter of credit in this court, which allowed the setoff and dismissed Bancec's complaint. The Second Circuit reversed. The Supreme Court granted certiorari and reversed the court of appeals. At the beginning of her opinion for the Court, Justice O'Connor posed the issue as follows:

> When Bancec brought suit on the letter of credit in United States District Court, Citibank counterclaimed, asserting a right to set off the value of its seized Cuban assets. The question before us is whether Citibank may obtain such a setoff, notwithstanding the fact that Bancec was established as a separate juridical entity.

*Id*.

The language in *Bancec* upon which Yugoimport relies has to do with Bancec's separate juridical status, which the Court discussed in considering the body of law that determines "whether the instrumentality may be held liable for actions taken by the sovereign." 462 U.S. at 621. Within that context, the Court stated:

> As a general matter, the law of the state of incorporation normally determines issues relating to the *internal* affairs of a corporation. Application of that body of law achieves the need for certainty and predictability of result while generally protecting the justified expectations of parties with interests in the corporation. Different conflicts principles apply, however, where the rights of third parties *external* to the corporation are at issue. To give conclusive effect to the law of the chartering state in determining whether the separate juridical status of its instrumentality should be respected would permit the state to violate with impunity the rights of third parties under international law while effectively insulating itself from liability in foreign courts. We decline to permit such a result.

*Id*. at 621-22 (citations and footnotes omitted; emphases in original). As the last sentence I have quoted presages, the Court's decision in *Bancec* adjudicates the rights of a third party, Citibank: a

third party because it was external to the government of Cuba and Bancec, that government's instrumentality. But the case at bar does not involve the rights of such a third party.

Yugoimport's briefs stress the Court's description of Bancec's separate juridical status. In that regard, the Court said:

> Increasingly during this century, governments throughout the world have established separately constituted legal entities to perform a variety of tasks. . . . The instrumentality is typically established as a separate juridical entity, with powers to hold and sell property and sue and be sued. . . . Due respect for the actions taken by foreign sovereigns and for principles of comity between nations, leads us to conclude—as the courts of Great Britain have concluded in other circumstances—that government instrumentalities established as juridical entities distinct and separate from their sovereign should normally be treated as such.

462 U.S. at 624-27.

Had the Court applied that rule in *Bancec*, Citibank would have lost its right to setoff, because the Cuban government had seized Citibank's property and Bancec (which the government subsequently dissolved) had during its existence been established as a juridical entity separate from the government. But Citibank won its right to setoff because the Court applied equitable principles derived from federal common law and international law. The opinion concludes:

> Giving effect to Bancec's separate juridical status in these circumstances, even though it has long been dissolved, would permit the real beneficiary of such an action, the Government of the Republic of Cuba, to obtain relief in our courts that it could not obtain in its own right without waiving its sovereign immunity and answering for the seizure of Citibank's assets—a seizure previously held by the Court of Appeals to have violated international law. We decline to adhere blindly to the corporate form where doing so would cause such an injustice. . . . We therefore hold that Citibank may set off the value of its assets seized by the Cuban Government against the amount sought by Bancec.

> Our decision today announces no mechanical formula for determining the circumstances under which the normally separate juridical status of a government instrumentality is to be disregarded. Instead, it is the product of the application of internationally recognized equitable principles to avoid the injustice that would result from permitting a foreign state to reap the benefits of our courts while avoiding the obligations of international law.

462 U.S. at 633-34.

Thus dissected, it becomes apparent that the Court's decision in *Bancec* furnishes little guidance in the resolution of the competing claims of Yugoimport and the Republics to the interpleaded funds. The case at bar does not involve a third party like Citibank, *external* to the governmental entities involved, which required the application of federal common law and international law concepts of equity to avoid an injustice. When the FDSP opened its account in BNY, there was only one national state: the SFRY. The SFRY has now dissolved into the Successor States, and three of them assert conflicting claims to the interpleaded funds, but there is no third party like Citibank involved in this case, and *Bancec*'s analyses of equity, federal common law, and international law have no relevance to it. Neither does corporate veil-piercing, in the traditional tort or contract liability sense. Yugoimport's argument hinges on the SFRY government's power over its *own* government agencies or instrumentalities, and the limitations of that power. *Bancec* does not address this issue, which is governed by SFRY law.

Moreover, *Bancec* did not involve a Succession Agreement such as the one the Successor States executed in this case, and accordingly gives no guidance with respect to its application to or effect upon the interpleaded funds. The question then arises: who should decide those questions?

    **3.**    **The Proper Forum for Decision**

Given the contentions of the parties, someone has to decide whether the FDSP should be

regarded as one of the "SFRY Federal Government Departments and Agencies" as those terms are used in Annex C to the Succession Agreement; and, if so, whether the interpleaded funds are subject to proportional distribution in accordance with the Agreement's terms.  These questions turn upon (a) SFRY law, *see Bancec*, and (b) the meaning of the Succession Agreement (which does not specifically define "Departments" or "Agencies").

If the Succession Agreement had not put in place the Standing Joint Committee to consider such questions, this Court would have to answer them.  It would be competent to do so.  The Supreme Court was manifestly competent in *Bancec* to parse the series of Cuban laws and resolutions restructuring that nation's banks.  But the Republics suggest, as an alternative form of relief, that proceedings in this case be stayed pending an application to the Standing Joint Committee (for which no analogous body existed in *Bancec*).  The Republics' suggestion is eminently sensible and I will adopt it.  Clearly it is preferable for senior Successor State representatives (some of them lawyers, one suspects, and certainly able to summon legal assistance) to interpret SFRY law.  And the superior ability of the Standing Joint Committee representatives to interpret the Agreement which gave them life requires no further analysis.  Moreover, the Second Circuit's opinion in *767 Third Avenue* teaches that the executive and judicial branches of the United States government both favor "a comprehensive resolution of succession issues among the successor states." 218 F.3d at 156.  One of the comprehensive aspects of the Succession Agreement is the creation of the Standing Joint Committee to resolve precisely the same sort of issues that arise out of this interpleader action.  This Court's disregard of the Committee would be in derogation of that executive and judicial policy.

Yugoimport's objections to this procedure are without merit.  It argues that it "is not a party to the Agreement and is therefore not bound by the forum-selection clause," Yugoimport's Br. at 23,

18

and "would have no standing to appear before the Committee established for resolution of disputes under the Agreement," Yugoimport's Reply Br. at 7. Of course Yugoimport did not sign the Succession Agreement: it is a compact between and signed by representatives plenipotentiary of the Successor States. The Agreement is the functional equivalent of a treaty between sovereign nations. FRY signed the Agreement on behalf of its then constituent republics, Serbia and Montenegro. Yugoimport is presently an agency or instrumentality of the Serbian government. The amount of the interpleaded funds is considerable and there is no reason to suppose that the Serbian representatives on the Committee, with undoubted standing, would not vigorously press Yugoimport's claim to the funds.

## IV. CONCLUSION

For the foregoing reasons, and in the exercise of my discretion, proceedings in this interpleader action, including a decision on the cross-motions for summary judgment, are stayed pending the Court's further order. The funds will remain in an interest-bearing account in the Registry of this Court.

The parties are directed to proceed with reasonable dispatch to place the issues raised by their competing claims before the Standing Joint Committee created by the Succession Agreement executed by the five Successor States in Vienna, Austria on June 29, 2001.

The parties are further directed to advise this Court as soon as the Standing Joint Committee arrives at a decision in the matter.

This Court retains jurisdiction over the case and the interpleaded funds for the purposes of adjudicating (1) any motion to enforce, vacate, or otherwise respond to a decision or other resolution

of the issues by the Standing Joint Committee,[10] (2) any application to lift the stay because of the failure or refusal of the Standing Joint Committee to consider the issues, and (3) such other, further or different motion or application as the justice of the cause may require.

It is SO ORDERED.

Date: New York, New York
May 11, 2007

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE

---

[10] In this regard, a useful analogy may be found in the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, enacted into domestic law at 9 U.S.C. § 201 *et seq*. Section 207 provides that a federal district court "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." Article V(1) of the Convention provides that recognition or enforcement of a foreign arbitral award may be refused on "proof that: . . . (b) the losing party was unable to present his case." Article V(2)(b) provides that recognition and enforcement may also be refused if it "would be contrary to the public policy" of the country where enforcement is sought. Such concerns might arise in the case at bar if the Standing Joint Committee issues a decision adverse to Yugoimport, and Yugoimport was able to show this Court that it was denied a fair opportunity to present its claim to the Committee, or suffered some other deprivation of what American law would regard as due process.