USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/29/11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

THE BANK OF NEW YORK,                           :      **ORDER AND OPINION GRANTING**
                                                :      **SUMMARY JUDGMENT TO THE**
                        Interpleader Plaintiff,  :      **REPUBLICS OF CROATIA AND**
                                                :      **SLOVENIA AND DENYING**
        -against-                               :      **YUGOIMPORT'S MOTIONS FOR**
                                                :      **SUMMARY JUDGMENT AND**
YUGOIMPORT SDPR J.P., REPUBLIC OF               :      **FURTHER DISCOVERY**
CROATIA, and REPUBLIC OF SLOVENIA,              :
                                                :      03 Civ. 9055 (AKH)
                        Interpleader Defendants. :

-------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

        This lawsuit, pending since 2003, requires the Court to declare ownership of

funds in its registry amounting to $2,526,233.76 and interest. The Bank of New York, as

Interpleader Plaintiff, instituted the present action, deposited the funds in the Court's registry,

and obtained a discharge from the lawsuit. The Interpleader Defendants are the disputing

claimants to the funds: they are Yugoimport SDPR J.P. ("Yugoimport"), the successor to the

original depositor of the funds in the Bank of New York, the Federal Directorate of Supply and

Procurement, or "FDSP"; and the Republics of Croatia and Slovenia ("Republics"), representing

the interests of the various states that succeeded the former Socialist Federal Republic of

Yugoslavia ("SFRY"). The dispute calls for interpretation of a multilateral treaty entered into by

the successor states, the Succession Agreement. The Succession Agreement followed a series of

treaty instruments known as the Dayton Accords, which brought a measure of peace to the

former nations of the SFRY after years of violence.

        The Succession Agreement contains a dispute resolution mechanism, but the

Interpleader Defendants have been unable to employ it. In the circumstances, this Court is

required to adjudicate the case and controversy before it. I hold, interpreting the clear and

1

unambiguous terms of the Succession Agreement, that the funds in the Court's registry should be distributed to the successor states of the SFRY and not to Yugoimport, for Yugoimport's predecessor-in-interest was an "agency" of the SFRY and the Succession Agreement provides that funds held by agencies of the SFRY should be distributed to the successor states.

## I.      Facts

### a.  The Historical Context of this Litigation

The instant dispute arises in the context of a long history of ethnic and racial tensions in the Balkans, a portion of Southern Europe extending from the Adriatic Sea in the West to the Carpathian Mountains in the East, and from the Alps in the North to the Aegean Sea in the South.  This area has long been populated by Slavs, Croats, Bulgars, Romas, Serbs, Turks, and other nationalities.  They have been Roman Catholic, Greek Orthodox, Eastern Orthodox, Muslim, Jewish, and members of other religions.  In the centuries leading up to World War I, this diverse land was controlled by the Austro-Hungarian Empire in the north, and the Ottoman Empire in the south.  These empires long feuded, and used their territorial holdings to press upon each other.  Much of the struggle centered on Bosnia, an Ottoman outpost against neighboring Austro-Hungarian territory.

It was in Bosnia that World War I began, with the assassination in 1914 of the Archduke Francis Ferdinand of Austria by Gavril Princep, a Bosnian Serb nationalist.  After World War I, pursuant to the Treaty of Versailles of 1919, Yugoslavia was created as the "Kingdom of Serbs, Croats, and Slovenes."  In 1929, the nation was formally renamed "Yugoslavia," and existed that way until World War II, from which it emerged as a socialist state, headed by Joseph Bronz Tito.  From 1946 to 1963, the country was known as the Federal People's Republic of Yugoslavia, or "FPRY."  In 1963, the name was changed to the Soviet

2

Federal Republic of Yugoslavia, or "SFRY." Its constituent states, generally speaking, were Croatia, Slovenia, Macedonia, Bosnia-Herzegovina, Serbia, and Montenegro. Serbia, perhaps the largest and most powerful of the constituent members of the SFRY, also held authority over Kosovo, a small semi-autonomous region in its southwestern region.

The SFRY enjoyed a period of relative stability from the end of World War II to the end of the 1980s. Beginning in 1989, following the fall of the U.S.S.R., long-simmering tensions boiled over, and the constituent states of the SFRY began to break away and seek independence. Croatia and Bosnia-Herzegovina were the first to attempt to secede from the SFRY. As a result, wars broke out between Croats and Serbs, and Serbs and Muslims. The fighting and the accompanying human tragedy are well known, with Bosnia again the centerpiece of the struggle. Thousands died and hundreds of thousands were displaced from their homes, victims of ethnic cleansing campaigns.

In November 1995, American efforts, led principally by Secretary of State Warren Christopher and Assistant Secretary of State Richard A. Holbrooke, brought an end to the fighting and brought a measure of peace to the region. In a series of agreements known as the Dayton Accords, Croatia and Bosnia-Herzegovina were recognized as independent republics, while Serbia and Montenegro reconstituted themselves as the Federal Republic of Yugoslavia ("FRY"). See General Framework Agreement for Peace in Bosnia and Herzegovina ("Dayton Accords"), Bosn. & Herz.-Croatia-Fed. Repub. Yugo., Dec. 21, 1995, 35 I.L.M. 75 (1996). The Dayton Accords recognized the Bosnia-Herzegovina Constitution, and provided terms for dispute resolutions, elections, protections of human rights, and reductions of military forces between those countries and the FRY. The Dayton Accords were signed by representatives of Bosnia-Herzegovina, Croatia, and the FRY, and the signatures were witnessed by the European

Union Special Negotiator and by representatives of France, Germany, Russia, the United Kingdom, and the United States.  To maintain peace in Bosnia, the North Atlantic Treaty Organization ("NATO") committed 60,000 ground troops to the region, 20,000 of them American.[1]

In the month following ratification of the Dayton Accords, December 1995, a Peace Implementation Council was organized for the purpose of assisting in the creation of agreements for peaceful, cooperative relations, by assisting the signatory states in forming mutual agreements to address the various topics enumerated in the Dayton Accords.  A High Commissioner also was appointed, and the Peace Implementation Council provided a mandate to the High Representative to oversee implementation of the Dayton Accords and to assist the parties in reaching agreements for peaceful cooperation.

The Dayton Accords did not end the violence in the region.  Prior to their enactment, in 1989, Kosovo, a mini-state within Serbia that borders Macedonia, Albania and Bosnia-Herzegovina, rebelled from Serbian authority, seeking to establish its independence.  The newly elected President of the FRY, Slobodan Milosevic, responded by stripping Kosovo of its autonomy and the Kosovars, in turn, voted formally to secede from the FRY.  Protracted and intense fighting followed.  The FRY army was drawn in, the Kosovar Liberation Army was overcome, and the fighting degenerated into mass killings and incessant shelling of the civilian population of ethnic Albanians.  Hundreds of thousands of Kosovar Albanians were displaced from their homes into internment camps.

In the late 1990s, NATO intervened in an effort to stop the violence in Kosovo.  A peace resolution, the Rambouillet Agreement, was proposed to resolve the issues between

---

[1] As of September 2000, NATO was comprised of the nations of Belgium, Canada, The Czech Republic, Denmark, France, Germany, Greece, Hungary, Iceland, Italy, Luxembourg, The Netherlands, Norway, Poland, Portugal, Spain, Turkey, The United Kingdom, and The United States.

Kosovo and the FRY. See Interim Agreement for Peace and Self-Government in Kosovo, http://www.state.gov/www/regions/eur/ksvo_rambouillet_text.html (last accessed Feb. 24, 2011). Pursuant to the Rambouillet Agreement, the independent state of Kosovo was to be recognized, organized under a constitutional government, with full protection of civil rights, free elections, humanitarian assistance, and economic development.

The Kosovar delegation accepted the Rambouillet Agreement, but the FRY rejected it and atrocities against Kosovars resumed. Again, other nations intervened. In April 1999, at a summit held in Washington, D.C., NATO Secretary-General Javier Solana, backed by the leaders of NATO, ordered air strikes against Belgrade, the capital of the FRY, and the massing of ground forces in the region. The United States contributed 40 percent of NATO's air power, as well as 25,000-30,000 ground troops, and the leadership of United States Army General Wesley Clark. Finally, in mid-1999, the shelling of the civilian population by Serbian forces and the killing and ethnic cleansing of ethnic Albanian Kosovars stopped, and the FRY relented.

In 2001, the five nation-states that comprised the former SFRY—Croatia, Slovenia, Bosnia-Herzegovina, Macedonia and the FRY—negotiated an end to hostilities and a permanent peace. Under the supervision of the Peace Implementation Council's High Representative, the office established by the Dayton Accords, the party-states executed an agreement recognizing the five states as the "successor states" to the SFRY, providing for the demise of the SFRY, and distributing the assets of the SFRY amongst themselves, the peoples and states of the former Yugoslavia.[2] See Agreement on Succession Issues Between the Five

---

[2] In June 2006, Serbia and Montenegro separated into independent states, ending their confederation as the FRY. Under their agreement, Montenegro agreed that it would not be a successor-state to the SFRY and not a party to the Succession Agreement.

Successor States of the Former State of Yugoslavia ("Succession Agreement"), Bosn. & Herz.-
Croat.-Maced.-Slovn.-F.R.Y., June 29, 2001, 41 I.L.M. 3 (2002).  The successor states
recognized themselves as "being in sovereign equality the five successor States" to the SFRY,
leaving behind any conflicts that could arise out of their new alignment.  Id., preamble.  The
principal purpose of the Succession Agreement was "to resolve questions of State succession
arising upon the break-up of the former Socialist Federal Republic of Yugoslavia."  Id.

   Articles 4 and 5 of the Succession Agreement establish a method of dispute
resolution of succession-related issues that might arise between the successor states.  Article 4
establishes a "Standing Joint Committee of senior representatives of each Successor State, who
may be assisted by experts," whose principal task is the "monitoring of the effective
implementation of this Agreement and serving as a forum in which issues arising in the course of
its implementation may be discussed."  Succession Agreement, art. 4.  Article 5 then states that
"[d]ifferences which may arise over the interpretation and application of this Agreement shall, in
the first place, be resolved in discussion among the States concerned."  Id. art. 5.  If the states
cannot resolve the matter, they either "refer the matter to an independent person of their choice,
with a view to obtaining a speedy and authoritative determination of the matter which shall be
respected" or "refer the matter to the Standing Joint Committee established by Article 4 of this
Agreement for resolution."  Id.

   Various provisions of Annex C to the Succession Agreement define the assets of
the SFRY for allocation among the successor states.  Article 1 to Annex C defines these assets as
"all financial assets of the SFRY (such as cash, gold and other precious metals, deposit accounts,
and securities), including in particular . . . accounts and other financial assets."  Id. Annex C, art.
1.  The financial assets are those in the name of both "SFRY Federal Government Departments"

but also of SFRY "Agencies." Id. Article 5 to Annex C provides the percentage shares of SFRY

assets that each successor state is to receive: Bosnia and Herzegovina, 15.5%; Croatia, 23%;

Macedonia, 7.5%, Slovenia, 16%, and the FRY, 38%. Id. Annex C, art. 5.

### b. Yugoimport and the Facts Giving Rise to this Dispute

Yugoimport was created by the FPRY on June 27, 1949, as "a state business of

state-wide significance" meant to engage in "the import and export of all types of goods" for the

state. Basic Law on State Business Enterprises, arts. 1, 3 (Act No. 5585/49) (June 27, 1949)

(FPRY). Its assets were contributed by the State, through the Minister of Finance of the FPRY.

Id. art. 3.

On July 28, 1971, several years after the FPRY had become the SFRY, a basic

law providing for the form and substance of agencies within the SFRY was passed. See Law on

Organizational Structure and Scope of Operations of Federal Administration and Federal

Organizations (Act No. 1045/71) (July 28, 1971) (SFRY). The law provided that federal

agencies were to be managed by "federal administration bodies" and "federal organizations," and

were to be organized as "federal bureaus, federal directorates, Yugoslav commissions for

cooperation with certain international organizations[,] and federal expert councils." Id. arts. 1,

19. In 1974, by amendment to the basic law, Yugoimport was merged into a new SFRY federal

agency-entity, known either as the Federal Office for Trading and Reserves of Special Purpose

Goods or the Federal Directorate of Trade and Special-Purpose Commodity Reserves ("Federal

Office for Trading and Reserves"). See Act on the Amendment of the Act on the Organization

and Scope of Functions of Federal Administrative Authorities and Federal Organizations, art. 3

(Act No. 21/74) (April 26, 1974) (SFRY); see also Statute of the Public Enterprise "Jugoimport-

SDPR," art. 2 (FRY Gazette No. 89/9) (Jan. 27, 1997) (FRY), promulgated under Law of the

7

Public Enterprise "Jugoimport-SDPR," (SRY Gazette No. 46/96) (Dec. 24, 1996) (FRY) (describing the merger of Yugoimport into the Federal Office for Trading and Reserves). The Federal Office for Trading and Reserves and was established as a "legal entity"; its purpose was to perform tasks "associated with . . . the national defense." Act on the Amendment of the Act on the Organization and Scope of Functions of Federal Administrative Authorities and Federal Organizations, art. 3.

In 1991, the SFRY reconstituted the Federal Office for Trading and Reserves as a new federal directorate, the Federal Directorate for Commerce of Special Purpose Products ("FDCSPP"). See Statute of the Public Enterprise "Jugoimport-SDPR," art. 2 (describing the legal relationship). The FDCSPP was "an institution that performs activities that are in the interests of the realization of the functions of the Federation in the area of foreign trade commerce with armaments and military equipment." Law on the Federal Directorate for Commerce of Special Purpose Products, art. 1 (SFRY Gazette No. 11/91) (1991) (SFRY). The position of Director of the FDCSPP was created, empowered to enact a "statute" providing for the entity's duties and obligations.[3]

The statute promulgated by the Director of the FDCSPP provided that the FDCSPP was a "legal entity with rights, obligations, and responsibilities determined by the law on the Directorate, other federal laws and this Statute," with "bylaws, instructions, internal rules, and decisions." Statute of the Federal Directorate for Commerce of Special Purpose Products, arts. 2, 4, (Act No.750-3) (May 8, 1991) (SFRY). The principal stated purpose of the FDCSPP was to import and export armaments:

---

[3] It appears that "laws" in the SFRY created entities such as the FDCSPP, and established directorates for them. The directorates, in turn, created "statutes" for the governance and operation of the entities. Compare Law on the Federal Directorate for Commerce of Special Purpose Products, art. 1, (SFRY Gazette No. 11/91) (1991) (SFRY) (establishing the FDCSPP), with Statute of the Federal Directorate for Commerce of Special Purpose Products, arts. 2, 4, (Act No.750-3) (May 8, 1991) (SFRY) (providing for governance and operation of the FDCSPP).

1. Import and export of armaments and military equipment, i.e. products, semi-finished products, modules, sub-modules, parts, raw materials, reproduction materials, equipment for production of armaments and military equipment, etc.;
2. Activities for acquiring and transferring rights on industrial property, knowledge, and experience;
3. Services (performing investment activities abroad, representation, mediation, overhauls, financial engineering, etc.)
4. Special forms of foreign commerce;
5. Activities stemming from international obligations taken on by SFRY;
6. Military-economic and scientific-technical cooperation; and
7. Other activities and services.

Id. art. 8. The statute further provided that the FDCSPP was to coordinate its activities with the armed forces of the nation: it was to

> direct[] its work in accordance with: the plans for developing and equipping of the military forces of SFRY; the plans and programs of the enterprises from the industry for armaments and military equipment and enterprises that inform investment work; other participants in foreign commerce; supply and demand of goods and services on the global market that are in connection with the type of work performed by the Directorate.

Id. art 12.

This FDCSPP was managed by a "Council of the Directorate," appointed representatives of the following various agencies of the SFRY:

1. Federal Secretariat for People's Defense;
2. Federal Secretariat for Foreign Affairs;
3. Federal Secretariat for Foreign Economic Relations;
4. Yugoslav National Bank;
5. The Yugoslav Association for Industries of Armament and Military Equipment; and
6. A representative from the employees of the Directorate.

Id. art. 24. The Council of the Directorate shared its duties with the Director of the Directorate, whose duties included "[e]nact[ing] the general act on the organization and the work and the systemization of tasks and jobs, and other general acts of the Directorate." Id. art. 15. The

earnings and profits of the FDCSPP were to be used "to replenish the funds spent and to provide for personal, common, and general social needs and responsibilities," that is, for the benefit of the SFRY. Id. The Council of the Directorate determined how to divide profits "according to the law," taking into consideration how well the "annual foreign commerce plan" and "development plan" were realized, as well as how profitable the FDSCPP had been for the year. Id. art. 19. The FDCSPP existed in this form for several years.

By 1996, the SFRY had been dissolved.  Croatia and Bosnia-Herzegovina had seceded and been recognized as autonomous states by the Dayton Accords, and Serbia and Montenegro had confederated as the FRY.  In late 1996, the FRY again reconstituted Yugoimport and merged into it the FDCSPP—now known as the Federal Directorate of Supply and Management, or "FDSP."[4]  See Law of the Public Enterprise "Jugoimport-SDPR." Yugoimport was established as a "public enterprise," to conduct "foreign trade with weapons and military equipment," with "state funds."[5]  Id. arts. 1, 4, 5.  Yugoimport was to be managed by a Director, a Managing Board, and Supervisory Board.  Statute on the Public Enterprise "Jugoimport-SDPR," arts. 8, 9.  The Managing Board was to be governmentally appointed and dismissed, and any business was to be done with "state funds" id. art. 5, for the "export of

---

[4] The January 1997 statute creating Yugoimport states that "Jugoimport-SDPR PE keeps up the legal continuity of the Federal Directorate of Supply and Procurement ("Official Gazette of SFRY" No. 11/91") and also notes that "[o]n the day when this statute comes to force the statute of the Federal Directorate of Supply and Procurement No. 750-3 from 8 May 1991 will be annulled." Statute of the Public Enterprise "Jugoimport-SDPR, arts. 1, 57. May 8, 1991, is the date the FDCSPP was established. Moreover, the September 1996 Belgrade Business Court order merging Yugoimport with the FDSP states that the latter was formed under the "Law on the Federal Directorate of Procurement and Supply (Official Gazette of SFRY 11/91)." Submission for Legal Transformation, VI Fi-1424/97. Law No. 11/91 and Statute No. 750-3 authorized creation of a single entity, which those codifications called the FDCSPP. Accordingly, it is reasonable to infer that the 1997 statute, again creating Yugoimport and referencing the FDSP, considered the FDCSPP and the FDSP as the same entity.

[5] The statute provides that "Jugoimport-SDPR PE deals with other activities as well" and lists a few hundred, which range from "production, processing, cooling and freezing animal meat" to "bookbinding and finishing processes" to "Children and youth resorts" to "Organizing fairs."  See Statute on the Public Enterprise "Jugoimport-SDPR" art. 4.

armament and defence equipment" and procurement of arms, http://www.yugoimport.com/main-menu/about-us.htm (information as of visit to website on July 17, 2006).[6]

### c. The Funds at Issue in this Litigation

Sometime in 1991 or early 1992, the FDSP opened a deposit account with the Bank of New York. On May 30, 1992, the United States froze the account under an Executive Order freezing "all property and interests in property in the name of the Government of the Socialist Federal Republic of Yugoslavia or the Government of the Federal Republic of Yugoslavia that are in the United States." Exec. Order. No. 12,808, 57 Fed. Reg. 23,299, 23,300 (May 30, 1992). The order froze assets of "the government of the Socialist Federal Republic of Yugoslavia, the government of the newly constituted Federal Republic of Yugoslavia, their respective agencies, instrumentalities and controlled entities, and any person acting or purporting to act for or on behalf of the foregoing." Id. A subsequent notice by the Office of Assets Control within the Department of the Treasury named the FDSP as an entity on the "Blocked Yugoslav Entities Currently Identified" list. Office of Foreign Assets Control General Notice No. 1., 57 Fed. Reg. 32051-02, 1992 WL 165946 (F.R.) (July 20, 1992). The funds remained frozen until February 2003, when the United States lifted the restriction.

When the government lifted the restriction, the Republics of Croatia and Slovenia claimed title to the account, contending that the FDSP and its successor-in-interest, Yugoimport, was an agency of the SFRY and that under the Succession Agreement the funds deposited by the FDSP were owned by the successor states, according to percentages provided in the Succession Agreement. These positions were supported by letters provided from representatives of

---

[6] Well after the facts and events giving rise to this lawsuit, and after the execution of the Succession Agreement, Yugoimport seems to have been reformed by Serbia, under Serbian law. This Yugoimport also has as its stated purpose the procuring of arm.. See http://www.yugoimport.com/index.php?name=About_Us (last visited April 11, 2011).

Macedonia and Bosnia-Herzegovina, who took the position that Yugoimport is a former state agency whose property is divisible under the Succession Agreement. Yugoimport, also claiming the funds, contended that the FDSP was an independent juridical entity, not an agency of the SFRY, and so was not bound by the Succession Agreement. Yugoimport's position was supported by a letter from a representative of Serbia, who took the position that only the Standing Joint Committee can decide this matter, and also that Yugoimport is a separate juridical entity and thus not subject to the Succession Agreement.

### d.  Procedural History of this Litigation

On April 14, 2003, in response to the competing claims of ownership of the deposit account, the Bank of New York filed this interpleader action in Supreme Court, New York County. Slovenia removed the case to this Court pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1441(d) and 1446, asserting that it was a foreign nation within the meaning of 28 U.S.C. § 1603(a). The case was assigned to Judge Charles S. Haight, who upheld jurisdiction under the FSIA. See Memorandum Op. and Order, Bank of New York v. Yugoimport SDPR J.P., 09 Civ. 0355 (CSH), 2007 WL 1378426, at *1 (S.D.N.Y. May 11, 2007) ("Yugoimport II"). After removal, BNY deposited the funds into the court registry and obtained a discharge on June 2, 2004, leaving only Interpleader Defendants to litigate. The Republics moved for summary judgment or, alternatively, for a stay to allow the Standing Joint Committee under the Agreement to make the determination it sought. Yugoimport cross-moved for summary judgment and opposed the stay request, arguing that since it was not a party to the Succession Agreement, it was not subject to the jurisdiction of the Standing Joint Committee.

Judge Haight ordered "discovery. . . limited to the FDSP's status" as an agency of the SFRY.  Memorandum and Order, Bank of New York v. Yugoimport, 03 Civ. 9055 (CSH), 2005 WL 2429424, at *2 (S.D.N.Y. Oct. 3, 2005) (internal citation omitted) ("Yugoimport I"). After reviewing the discovery, Judge Haight issued a Memorandum Opinion and Order on May 11, 2007, ruling (a) that SFRY law was the appropriate source of governing law for the issue whether the FDSP was an agency of the SFRY; (b) that the Succession Agreement determined the disposition of FDSP's assets if it was an agency; and (c) that under the Succession Agreement, the Standing Joint Committee was the appropriate body to set forth the content of SFRY law and decide these issues.   See Yugoimport II, 2007 WL 1378426, at *10-11.  Judge Haight stayed the case and referred the parties to the Standing Joint Committee to seek dispositive resolution of these issues, noting that the  Succession Agreement "put in place the Standing Joint Committee to consider such questions."  Yugoimport II, 2007 WL 1378426, at *10.  In the interim, Judge Haight retained jurisdiction to consider if, at some point, the stay should be lifted and whether "such other, further, or different motion or application as the justice of the cause may require" should be ordered.  Id. at *11.

In the Fall of 2008, this case was reassigned to me.  In the time since Judge Haight issued his order, and in almost another three years that the case has been before me, the Standing Joint Committee has not met, nor have the nations appointed its members, despite two additional orders that I issued in December 2009 and February 2010, directing the parties to move this case towards a resolution.  Order Regulating Proceedings, Bank of New York v. Yugoimport SDPR J.P., 03 Civ. 9055 (Doc. No. 38) (S.D.N.Y. Dec. 11, 2009); Id. Doc. No. 41.

## II.     Standard of Review

Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Roe v. City of Waterbury, 542 F.3d 31, 35 (2d. Cir. 2008) (internal citation omitted).  Genuine issues of material fact exist if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  But, "[m]ere speculation and conjecture is insufficient to preclude the granting of the motion." Harlen Assocs. V. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001).  When, as here, the Court faces cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (internal citation omitted).  In cases calling for interpretation of treaties, summary judgment is appropriate if the treaty is unambiguous on its face and the intent of the parties can be ascertained as a matter of law.  Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir. 2005).  "[W]hen the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment."  Id.

## III.     Discussion

### a.    Whether This Court Should Adjudicate the Issues Presented

As Judge Haight noted, the Succession Agreement calls for a Standing Joint Committee to resolve questions of succession.  Judge Haight stayed this case in May 2007 to

allow the parties to pursue that course.  Yugoimport II, 2007 WL 1378426, at *10.  It is now
April 2011 and, in four years and despite much prodding by the Court, no Standing Joint
Committee has been convened.  In such circumstances, where the parties have been either unable
or unwilling to appoint the members of the Standing Joint Committee, or the Standing Joint
Committee has been unable or unwilling to perform its appointed task of resolving disputes, I
must decide the case and controversy presented to this Court.  See Colorado River Water
Conservation Dist. v. United States, 424 U.S. 800, 817 (1976) (district courts have a "virtually
unflagging" obligation to exercise the jurisdiction given to them).  I therefore terminate the stay
put in place by Judge Haight and proceed to decide the pending motions.

### b.  Whether Yugoimport is an Agency

Yugoimport contends that because the FDSP was formed as a corporation, it was
a juridical entity separate from the SFRY, and is not subject to the Succession Agreement unless
found to be an "alter ego" of the SFRY.  The Republics argue that the technical corporate form
of the FDSP is irrelevant, for whatever its form, it was organized, and it functioned, as an agency
of the SFRY.  Therefore, the Republics argue, the Succession Agreement requires allocation of
the funds to the successor states.

### 1.  Choosing the Law to be Applied

This case was filed in Supreme Court, New York County, and removed by
Slovenia to this court.  Slovenia invoked its status as a foreign sovereign to effect removal, as
authorized by 28 U.S.C. § 1606 of the FSIA.  Pursuant to the FSIA, the law to govern the parties
should be determined and applied as if the lawsuit were between private individuals, "in the
same manner and to the same extent as a private individual under like circumstances."  28 U.S.C.
§ 1606; Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 489 (1983).  The district court,

as in a case of diverse citizenship, first must apply the choice of law rules of the state in which

the district court is situated, and then the substantive law of the appropriate state or nation thus

found.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941) (holding that in a

diversity case, the forum state's choice of law rules are to be applied); Karaha Bodas Co., LLC v.

Perushaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina"), 313 F.3d 70, 84 (2d Cir.

2002) (applying Klaxon in the FSIA context); Barkanic v. Gen. Admin. of Civil Aviation of the

People's Republic of China, 923 F.2d 957, 960 n.3 (2d Cir. 1991) (same).  Accordingly, the

choice of law rules of the forum, New York, determine the law to be applied in this case.

### 2.  New York Conflicts Law

Yugoimport and its predecessors were incorporated under the laws of the SFRY

and previous governments of Yugoslavia.  In New York, the status and nature of a corporation is

considered an "internal" matter, determined by the law of the state or nation that created the

corporation and pursuant to which it exists. See CTS Corp. v. Dynamics Corp. of Am., 481 U.S.

69, 89 (1987) ("No principle of corporation law and practice is more firmly established than a

State's authority to regulate domestic corporations.").  The "generally accepted choice-of-law

rule with respect to  . . . 'internal affairs' [of the corporation] is to apply the law of the place of

incorporation."  Zion v. Kurtz, 50 N.Y.2d 92, 100 (N.Y. 1980); see also Diamond v. Oreamuno,

24 N.Y.2d 494, 503-04 (N.Y. 1969) (holding that for issues of corporate governance, "[t]he

primary source of law . . . ever remains that of the State which created the corporation.").

New York courts would look to SFRY law to resolve the issues as to

Yugoimport's status.  But if, as to particular material issues, SFRY law cannot be found, New

York courts would look to New York law insofar as it represents generally accepted legal

principles.  Rogers v. Grimaldi, 875 F.2d 994, 1002 (2d Cir. 1989).

16

Yugoimport argues for a different source of law, federal common law, and cites First National City Bank v. Banco Para El Comercio Exterior de Cuba ("Bancec"), 462 U.S. 611, 620 (1983). Yugoimport argues that under Bancec its property cannot be considered SFRY's property unless it was an "alter ego" of the SFRY, and further argues that it was not such an alter ego. Yugoimport's argument is without merit.

The Bancec case upheld Citibank's right to offset debts owed to it by the government of Cuba against Citibank's obligation to pay a letter of credit to the national bank of Cuba. Bancec, an entity organized as a wholly-owned but separate juridical entity under Cuban law to serve as Cuba's "official autonomous credit institution for foreign trade," purchased sugar for export from another instrumentality of the Cuban government, then sold the sugar to the Cuban Canadian Sugar Company, a private company. Citibank provided Bancec a letter of credit on behalf of the buyer. One month later, Cuba nationalized all property belonging to American citizens and entities in Cuba, including Citibank's branch offices in Cuba. Thereafter, when the letter of credit became due and Bancec demanded payment of the full amount, Citibank offset the value of the branches it had held in Cuba against the letter of credit.

Bancec sued Citibank in the United States District Court for the Southern District of New York, contending that the matter was controlled by Cuban law, that under Cuban law, Bancec was a juridical entity distinct from the Cuban government, and that Citibank therefore could not offset its claims against Cuba. The district court rejected the argument and upheld the offset, holding that it was appropriate as against the instrumentality of the Cuban government. Banco Nacional de Cuba v. Chase Manhattan Bank, 505 F. Supp. 412, 427 (S.D.N.Y. 1980). The Court of Appeals reversed, but the Supreme Court affirmed the holding of the district court. The Supreme Court held that the issues did not pertain to Bancec's internal affairs, but rather to

the rights and obligations of a third party, Citibank. The Supreme Court refused to allow Bancec's separate juridical status to defeat the rights of Citibank and to insulate the Cuban government from the wrongs it inflicted in expropriating Citibank's assets: Cuba, the sole owner and beneficiary of Bancec's operations, could not be allowed "to obtain relief in our courts that it could not obtain in its own right without waiving its sovereign immunity and answering for the seizure of Citibank's assets." 462 U.S. at 621. Thus, because the issues did not concern the "*internal* affairs of the corporation," but rather "the rights of third parties *external* to the corporation," the Supreme Court applied "principles . . . common to both international law and federal common law . . . informed both by international principles and by articulated federal congressional policies." Id. at 623 (emphasis in original).

The case before me is different from Bancec. There is no third party before me who seeks redress, as there was in Bancec; the issue before me relates solely to the relations between the FDSP and its creator, the SFRY. The issues of this lawsuit involve only the FDSP's internal affairs, and Bancec is not relevant. Compagnie Noga D'Importation et D'Exportation, S.A. v. Russian Fed'n, 361 F.3d 676, 685 (2d Cir. 2004). The law to be applied is the law pursuant to which the FDS was created and functioned, the law of the SFRY, its predecessors in interest and its successors in interest.[7] That said, Bancec does provide useful observations about how states use the corporate form to create agencies and instrumentalities.

---

[7] If there is a federal interest to be vindicated, cf. Pescatore v. Pan Am. World Airways, Inc., 97 F.3d 1, 10-11 (2d Cir. 1996), it lies in the implementation of the Dayton Accords and the Succession Agreement, and not in their frustration, as would result from Yugoimport's argument. The United States played an active role in aiding the negotiations that, after many years, resulted in the agreed dissolution of the SFRY, and provided for the distribution of its assets to the constituent states that succeeded it, finally bringing an end to the wars and ethnic conflicts that afflicted the area.

### 3.  Under SFRY Law, the FDSP Constituted an Agency of the State

Yugoimport argues that because the FDSP was set up as a corporation, it was a juridical entity distinct from the state, and thus not subject to the Succession Agreement.  But there is nothing inconsistent, or even unusual, about a state employing the corporate form to create an agency.  In Bancec, the Supreme Court surveyed a broad array of scholarship on this point, and observed:

> Increasingly during [the 20th] century, governments throughout the world have established separately constituted legal entities to perform a variety of tasks.  The organization and control of these entities vary considerably, but many possess a number of common features.  A typical government instrumentality, if one can be said to exist, is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law.  The instrumentality is typically established as a separate juridical entity, with the powers to hold and sell property and to sue and be sued.  Except for appropriations to provide capital or to cover losses, the instrumentality is primarily responsible for its own finances.  The instrumentality is run as a distinct economic enterprise; often it is not subject to the same budgetary and personnel requirements with which government agencies must comply.
>
> These distinctive features permit government instrumentalities to manage their operations on an enterprise basis while granting them a greater degree of flexibility and independence from close political control than is generally enjoyed by government agencies.  These same features frequently prompt governments in developing countries to establish separate juridical entities as the vehicles through which to obtain the financial resources needed to make large-scale national investments.

Bancec, 462 U.S. at 624-25; see also Fletcher Cyclopedia of Corporations § 58 (2011) ("[A] public corporation is one that is created for political purposes with political powers to be exercised for purposes connected with the public good in the administration of civil government.").  These observations in Bancec are fully illustrated by this case: the laws and regulations of the various national iterations of Yugoslavia provided for the creation and

operation of the FDSP as a state enterprise, entirely owned by the state, to perform operations of the state, particularly the procuring and trading in arms and armaments for the Yugoslav state. The FDSP was to be managed by appointees of the Yugoslav state, and was to be accountable to ministers and other officials of the state.

Further, as provided by the 1971 basic law, the FDSP had no stock and no shareholders. It was managed by a Council of the Directorate, an entity made up of Secretaries of various SFRY cabinets such as "People's Defense" and "Foreign Affairs." Law on the Public Enterprise "Jugoimport-SDPR," art. 24. The operating statute appointed an individual Director of the Directorate to oversee day-to-day functioning and to answer directly to the state-appointed Council. The Director was to use any earnings "to replenish the funds spent and to provide for personal, common, and general social needs and responsibilities." Id. art. 16. The Council of the Directorate decided how to divide profits in view of the need to support other policy objectives. Id. art. 19. Its profit became SFRY property and were distributed under the SFRY's authority. And it could acquire property, but only in "accordance with the plans for developing and equipping of the military forces of SFRY." Statute of the Federal Directorate for Commerce of Special Purpose Products, art. 12. Clearly, the FDSP was an agency of the SFRY.

There is nothing unusual about a publicly owned and managed corporation performing state functions. In New York, such agencies are known as "public benefit corporations," entities "organized to construct or operate a public improvement wholly or partly within the state, the profits of which inure to the benefit of this or other states, or to the people thereof." N.Y. Gen. Constr. Law § 66 (McKinney 2011). Public benefit corporations are created pursuant to an organizing statute. See, e.g., Sightseeing Tours of Am., Inc. v. Air Pegasus Heliport, Inc., 835 N.Y.S. 2d 561, 562 (N.Y. App. Div. 2007) (describing the Hudson River Park

Trust, a public benefit corporation organized by the Hudson River Park Act). They enjoy broad

discretion to perform their state-mandated functions. See Steel Los III/Goya Foods, Inc. v.

Board of Assessors of County of Nassau, 10 N.Y.3d 445, 450 n.1 (N.Y. 2008) (Nassau County

Development Agency is a public benefit corporation possessing broad authority); Huerta v. New

York City Transit Auth., 735 N.Y.S.2d 5, 9 (N.Y. App. Div. 2001) (MTA is a public benefit

corporation that has broad authority to carry out functions). They have broad general powers,

such as the power to sue and be sued, acquire real and personal property, make bylaws for the

management of their affairs, appoint officers, agents, and employees, and enter into contracts.

Foster Wheeler Broome County, Inc. v. County of Broome, 713 N.Y.S.2d 92, 95 (N.Y. App.

Div. 2000). And their management of funds is subject to audit by the state, specifically the New

York State Comptroller. N.Y. Charter School Ass'n, Inc. v. DiNapoli, 13 N.Y.3d 120, 134 (N.Y.

2009) (Lippman, C.J., concurring).

   The New York approach to public corporations is a generally accepted one. See

Fletcher Cyclopedia of Corporations § 57 ("A 'public corporation' . . . may be defined as a

corporation that is created by the state as an agency in the administration of civil government.").

Indeed, it is hardly regarded as a novel or unusual corporate form. Cf. United Haulers Assoc. v.

Oneida-Herkimer Solid Waste Mgmt Auth., 550 U.S. 330, 334 (2007) (considering whether

Congress could exercise power under the Commerce Clause to regulate activities of a public

benefit corporation). And just about every state in the Union utilizes it. Most states authorize

public benefit corporations for a broad number of purposes. See Ark. Code Ann. § 4-33-202

(West 2010) (Arkansas); Cal. Corp. Code § 5130 et seq. (West 2010) (California); Conn. Gen.

Stat. § 22a-115 (West 2010) (Connecticut); Del. Code. Ann. tit. 10, § 8136 (West 2010)

(Delaware); D.C. Code § 47-393 (2010) (Washington, D.C.); Haw. Rev. Stat. § 414D-14 (West

2010) (Hawaii); Ind. Code. § 23-17-2-23 (West 2010) (Indiana); Iowa Code. § 504.1705 (West

2010) (Iowa); La. Rev. Stat. Ann. § 33:9022 (2010) (Louisiana); Me. Rev. Stat. tit. 13-B, § 102

(2010) (Maine); Md. Code Ann., State Finance and Procurement, § 10A-101 (West 2010)

(Maryland); Mass. Gen. Laws. ch. 6C, § 62 (West 2010) (Massachusetts); Mo. Ann. Stat.

§ 335.096 (West 2010) (Missouri); Mont. Code Ann. § 35-2-114 (2010) (Montana); Neb. Rev.

Stat. § 21-1914 (2010) (Nebraska); N.J. Stat. Ann. § 17A:71C-19 (West 2010) (New Jersey);

Ohio Rev. Code Ann. § 1702.01 (West 2010) (Ohio); Or. Rev. Stat. § 65.001 (West 2010)

(Oregon); S.C. Code Ann. § 33-31-301 (2010) (South Carolina); Tenn. Code Ann. § 48-52-102

(West 2010) (Tennessee); Vt. Stat. Ann. tit. 11B, § 2.02 (West 2010) (Vermont); Wyo. Stat.

Ann. § 17-19-202 (West 2010) (Wyoming).  Others recognize them for discrete purposes. See

Alaska Stat. § 29.35.805 (West 2010) (Alaska) (allowing public benefit corporation for waste

management); Ariz. Rev. Stat. Ann. § 49-765 (Lexis 2010) (Arizona) (same); Colo. Rev. Stat.

§ 30-20-107 (West 2010) (Colorado) (same); Fla. Stat. § 376.3075 (West 2010) (Florida)

(managing petroleum spill sites); N.D. Cent. Code § 40-61-02 (West 2010) (North Dakota)

(parking authority); Okla. Stat. tit. 27A, § 2-11-603 (2010) (Oklahoma) (computer equipment

recovery); R.I. Gen. Laws § 46-24-2 (West 2010) (Rhode Island) (management of the Pawtuxet

River); Va. Code. Ann. § 56-557 (West 2010) (Virginia) (transportation management); W. Va.

Code Ann. § 20-1-16 (West 2010) (West Virginia) (regulation of natural resources).

   Yugoimport cannot rebut the proposition that, though the FDSP was a

corporation, it functioned as an agency.  Rather, Yugoimport baldly asserts that because the

FDSP was formed as a corporation, it cannot be considered a state agency unless found to be an

"alter ego" of the SFRY.  Arguments about "alter egos" and the companion "veil piercing"

doctrine are not relevant.  This is not a case of a creditor of a corporation seeking to press a

corporate obligation against the owners of the corporation. <u>E.g.</u>, <u>Guptill Holding Corp. v. State</u>, 307 N.Y.S.2d 970, 972-73 (N.Y. App. Div. 1970), <u>affirmed</u>, 21 N.Y.2d 897 (1972). Nor is it a case where a public benefit corporation seeks to shield itself against a claim by invoking the sovereign status of its owner. <u>See, e.g.</u>, <u>Forman v. Comm. Servs., Inc.</u>, 500 F.2d 1246, 1256 (2d Cir. 1974), <u>reversed on other grounds</u>, 421 U.S. 837 (1975) (public corporations asserting "alter ego" status typically employ it to attain sovereign immunity).

In this case, the SFRY, the owner of the FDSP, has been dissolved, and the successor states have provided for distribution of its assets, including the assets of its agencies, to its former constituent, now successor, states. The parties have not shown any law of the SFRY, or of a previous government of Yugoslavia, that provides a rule for dealing with a corporation's existence in these circumstances. Accordingly, per New York choice of law rules, New York law and generally accepted legal principles controls. <u>Rogers</u>, 875 F.2d at 1002.

Usually, since a corporation is "a creature of the state by which it is chartered," 19 Am. Jur. 2d § 2349 (2011), when the state and its laws have ceased to exist, the corporation cannot exist any longer either.[8] Now that the SFRY does not exist anymore, there can be no independently existing Yugoimport. Were it otherwise, Yugoimport would become a free-standing corporation, accountable to no nation, free to traffic in arms and armaments for its own benefit or for the benefit of some other nation. I note, for example, that Serbia has created another Yugoimport, <u>see</u> http://www.yugoimport.com/index.php?name=About_Us (last visited April 22, 2011). The similarity in name and function of the new Yugoimport, and the support

---

[8] This is consistent with the more general rule that business entities cease to exist when deprived of an essential feature of existence. For instance, for-profit corporations cease to exist when their charter expires. 19 Am. Jur. 2d § 2352. Partnerships are dissolved upon any change in the relationship of the partners, such as when a partner departs. Partnership Law & Practice § 16:1 (2010). The point is straightforward: business entities are artificial entities that exist under rules and conditions created by law. <u>E.g.</u>, <u>People v. Byrne</u>, 77 N.Y.2d 460, 465 (N.Y. 1991) (noting that corporations are legal fictions). When there is no more law providing for the corporation, then there can be no more corporation.

23

Serbia has given to its argument about being a separate juridical entity, suggests an effort by

Serbia to capture 100 percent of Yugoimport's financial assets, and the continuity of

Yugoimport's operations as a Balkan arms merchant.

For the reasons I have discussed, I hold that the FDSP was an agency of the

SFRY.

### c.  Implementation of the Succession Agreement

The terms of the Succession Agreement, providing for the distribution of the

assets of the SFRY, including all its financial assets, in its name and in the name of its agencies,

are clear and unambiguous.  "Treaties are to be interpreted upon the principles which govern the

interpretation of contracts . . . with a view to making effective the purposes of the high

contracting parties."  Sullivan v. Kidd, 254 U.S. 433, 439 (1921); see also Wright v. Henkel, 190

U.S. 40, 57 (1903) ("Treaties must receive a fair interpretation, according to the intention of the

contracting parties.").  Like a statute, "[t]he interpretation of a treaty . . . begins with its text."

Medellin v. Texas, 552 U.S. 491, 506 (2008).  Whether a contract or a statute, the analysis is

essentially the same: to give effect to the intent of the parties to the agreement—or, in the case of

a statute, to the legislature.  See, e.g., Jones v. Bill, 10 N.Y.3d 550, 555 (N.Y. 2008) (statute);

Greenfield v. Philles Records, 98 N.Y.2d 562, 569 (N.Y.2002) (contract).  If the text of the treaty

is clear and unambiguous, it is to be enforced according to its terms, without the need for

extrinsic evidence.  Jones, 10 N.Y.3d at 555; Greenfield, 98 N.Y.2d at 569.

The text of the Succession Agreement is clear and unambiguous, and provides for

the distribution of the funds to the successor states in the proportions provided by the Agreement.

Article 1 to Annex C of the Succession Agreement provides that the assets to be divided among

the successor states include "all financial assets of the SFRY (such as cash, gold and other

precious metals, deposit accounts, and securities), including in particular . . . accounts and other

financial assets in the name of the SFRY Federal Government Departments and Agencies."

Succession Agreement, Annex C, art. 1.  Indeed, the only issue presented by the parties is

whether the FDSP satisfies the term "agency" under Annex C.  And the discussion in this

Opinion makes clear that the FDSP was an agency of the SFRY within the meaning of the

Succession Agreement, and subject to the distribution terms of it.

### d.  Further Discovery is not Needed

Yugoimport contends Annex C is ambiguous as to the term "agency," and argues

that discovery is necessary to clarify its meaning.  Specifically, Yugoimport argues that because

Annex G to the Succession Agreement protects property rights of "juridical persons", and

because the May 8, 1991 statute provided the FDSP with "the status of a legal person," Statute of

the Federal Directorate for Commerce of Special Purpose Products, Yugoimport's property is

shielded and continues to belong to it.  The argument is without merit.

In relevant part, Annex G to the Succession Agreement states, "[p]rivate property

and acquired rights of citizens and other legal persons of the SFRY shall be protected by

successor States in accordance with the provisions of this Annex."  Succession Agreement,

Annex G, art. 1 (emphasis added).  The balance of the Annex does not describe the kind of assets

at issue in this case.  Rather, it refers to assets held in the various successor states, and to rights

"to intellectual property, including patents, trade marks, copyrights, and other allied rights (e.g.,

royalties)."  Id. arts. 2, 3.  The other articles are similarly off point.  Further, it is generally

accepted that public benefit corporations are considered "persons," Levy v. City Comm'n on

Human Rights, 85 N.Y.2d 740, 743-44 (NY 1995), because they have powers like the right to

25

contract, own property, and sue and be sued, Foster Wheeler Broome County, 713 N.Y.S.2d at 95. There is nothing inconsistent about being both an agency and a public corporation.

## IV. Conclusion

For the reasons discussed, I hold that the FDSP was an agency of the SFRY, and that the funds deposited by the FDSP, a predecessor in interest to Yugoimport, constitute financial assets of the SFRY that are subject to distribution and allocation under the Succession Agreement. I grant the Republics' motion for summary judgment and order the funds on deposit in the Court's registry to be remitted to them for distribution to the successor states in accordance with the proportions provided by the Succession Agreement. I deny Yugoimport's cross-motion and its alternative motion for further discovery. Counsel for the Republics shall submit an order within two weeks of today, providing for payment by the Clerk of Court to them, for the benefit of all the successor states in accordance with their allocated interests, fully disposing of all funds in the Court's registry, net of fees and charges.

The Clerk shall mark the case closed.

SO ORDERED.

Dated:     April 29, 2011
          New York, New York

ALVIN K. HELLERSTEIN
United States District Judge